United States Court of Appeals,

Eleventh Circuit.

No. 94-8403.

Gregory Alan NOVAK, individually and by his next friend June Lowery Novak;  June Lowery Novak, individually and on behalf of her son Gregory Alan Novak, Plaintiffs-Appellants,

v.

COBB COUNTY KENNESTONE HOSPITAL AUTHORITY d/b/a Kennestone Hospital;  Samuel D. Bishop;  Bradley E. Henderson;  John David Tucker;  Richard G. Gray;  W. Grady Pedrick;  Jerry A. Landers, Jr. and Robert D. Ingram, Defendants-Appellees.

Feb. 14, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:90-01316-CV-JEC), Julie E. Carnes, Judge.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and WELLFORD[*], Senior Circuit Judge.

TJOFLAT, Chief Judge:

I.

In the early morning hours of June 18, 1989, Gregory Alan Novak, then sixteen years old, fell asleep at the wheel of his automobile, crashed into a guard rail on I-575 in Cherokee County, Georgia, and was seriously injured.  Novak was removed from the scene by ambulance and taken to Kennestone Hospital, a facility operated by the Cobb County Kennestone Hospital Authority.  There, it was determined that Novak had sustained numerous injuries, including fractures of both legs and multiple lacerations.

Shortly after arriving at the hospital's emergency room, Novak, anticipating that a blood transfusion might be needed, told

---

[*]Honorable Harry W. Wellford, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

the staff not to give him any blood.[1]  Novak said that he was a Jehovah's Witness and that it was against his religious beliefs to receive blood.

The orthopedic physician handling Novak's case, Dr. Bradley E. Henderson, concluded that surgery would be needed to repair Novak's fractured right leg.  Novak's father, the only family member on the scene, consented to the surgery.  He did so, however, with the understanding that Novak be given no blood during the procedure. (Novak's father was not a Jehovah's Witness, but his mother, in whose custody Novak had been since his parents' divorce, was. Novak's father knew that she, as well as his son, would object to any blood transfusion.)  Dr. Henderson believed that Novak could withstand the surgical procedure without a blood transfusion; accordingly, in the early morning hours of June 18, he performed the operation.

Novak lost a considerable amount of blood as a result of his injuries and the subsequent triage and surgery.  By the early afternoon of June 19, he had become severely anemic.  Novak's blood count and blood pressure were falling at such a rate that Drs. Henderson and John David Tucker, the general surgeon on the case, after consulting Dr. Richard G. Gray, a hematologist, were convinced that, without a blood transfusion, Novak would likely

_____

[1]As a minor, however, Novak could not withhold his consent to medical treatment.  *See* O.C.G.A. § 31-9-7 (1982).  The orthopedic physician treating him noted in Novak's hospital record that Novak had objected on religious grounds to the receipt of blood.

die.[2]  Mrs. Novak and her son knew this;  they continued to reject the physicians' recommendations, however.  A transfusion would be against their religious beliefs.

At this point, Drs. Henderson and Tucker informed the hospital's management of Novak's condition and of Mrs. Novak's refusal to allow a transfusion—even if necessary to save Novak's life.  The matter was assigned to Samuel Bishop, the hospital's Director of Risk Management, and he immediately contacted the law firm that represented the hospital and explained the situation.[3]  After consulting with Dr. Henderson and confirming the information they had received—that without a transfusion, Gregory Novak could die at any time—attorneys W. Grady Pedrick and Jerry A. Landers, Jr. decided to petition the Cobb County Superior Court for the appointment of a guardian *ad litem.*  The person they had in mind for the appointment was Robert Ingram, a practicing lawyer in Cobb County.  Landers contacted Ingram, advised him of Gregory Novak's condition and of his and his mother's refusal to allow a blood transfusion, and asked him whether he would to serve as guardian *ad*

---

[2]According to Dr. Gray, who was called into the case as a consultant in the afternoon of June 19, Novak's blood count was at a "critical" level;  without a blood transfusion, Novak could succumb to death from, among other things, circulatory failure, renal failure, and liver failure.

[3]Bishop, a nonlawyer, knew that under Georgia law, Gregory Novak, because he was a minor, could not withhold his consent to the blood transfusion his treating physicians were recommending. *See* O.C.G.A. § 31-9-7 (1982).  At the same time, he was uncertain whether Novak or his mother could withhold consent on religious grounds;  in short, he could not reconcile their legal rights with the principle of Georgia law that a minor is not competent to decide whether he should live or die.  Given these circumstances, Bishop felt obligated to refer the matter to the hospital's attorneys.

*litem* if appointed. Ingram said he would; the assignment would present no conflict of interest on his part.

They filed their petition in the afternoon of the 19th, at 4:49 p.m. The petition, which sought the appointment of a guardian *ad litem* for the sole purpose of determining whether the blood transfusion the physicians were recommending would be in Gregory Novak's best interest, was assigned to Judge P. Harris Hines. Because the petition presented a matter that needed immediate attention, Judge Hines considered it within minutes, without notice to Novak or his mother.[4] After hearing from Pedrick and Landers and reading Dr. Henderson's affidavit, Judge Hines granted the petition and appointed Ingram guardian *ad litem* for the limited purpose described in the petition.

At a little after 9:00 the following morning, June 20, Judge Hines telephoned Bishop, learned that Novak's condition had deteriorated during the night, and told Bishop that he was convening a hearing at the hospital as soon as he could get there. The hospital's attorneys and Novak's treating physicians were to attend the hearing.

The hearing began at 9:35 a.m. in the hospital's intensive care unit where Gregory Novak was confined. Judge Hines handled the hearing himself in that he, alone, examined the witnesses: Drs. Henderson and Tucker, Novak's primary treating physicians, and members of the hospital's staff. The hospital's attorneys, Pedrick and Landers, simply stood by. The physicians testified that

---

[4]Judge Hines held the hearing without notice to Gregory Novak or his parents because the petition alleged the need for immediate emergency relief. *See* O.C.G.A. § 15-11-32(b).

Novak's condition was continuing to deteriorate and that, without a blood transfusion, he would probably die.

At the conclusion of the hearing, the guardian *ad litem* asked the court to order a transfusion. In response, the court noted for the record that Mrs. Novak had not changed her position—a blood transfusion would offend her and her son's religious beliefs—but held that her wishes could not be imposed on her minor child given the life or death situation at hand. An order authorizing the treating physicians to arrange for the blood transfusion was therefore entered.

The transfusion was promptly carried out; Gregory Novak received three units of packed red blood cells. His blood count improved significantly, and he suffered no untoward effects from the procedure. In due course, he fully recovered from his injuries.

## II.

On June 18, 1990, Gregory Novak and his mother, June Lowrey Novak, brought this suit. They seek compensatory and punitive damages from (1) Gregory Novak's treating physicians, Drs. Henderson and Tucker, (2) Dr. Gray, the hematologist whom Dr. Henderson consulted on June 19, (3) the governmental authority that operates the hospital, (4) the hospital's Director of Risk Management, Samuel Bishop, (5) the attorneys, Grady Pedrick and Jerry Landers, who petitioned the Cobb County Superior Court for the appointment of a guardian *ad litem,* and (6) the guardian *ad litem,* Robert Ingram.

The Novaks' amended complaint, which is the pleading before

us, contains eighteen counts; some of the counts, such as count one, assert several discrete causes of action.[5] In the first twelve counts, Gregory Novak seeks $12,500,000 in compensatory damages, plus punitive damages; in the remaining counts, June Novak seeks $6,500,000 in compensatory damages plus punitive damages. Some of the Novaks' claims allege federal constitutional violations and are brought under 42 U.S.C. § 1983. The remainder allege violations of Georgia constitutional, statutory, or common law rules.

The district court concluded that the Novaks' federal claims were meritless and gave the defendants summary judgment. Having disposed of the Novaks' federal claims in this fashion, the court dismissed their pendent state law claims without prejudice. We agree with the district court that the Novaks have no valid claim under the United States Constitution and thus affirm its summary disposal of their section 1983 claims.[6] Given this disposition, we also affirm the court's dismissal of the Novaks' pendent claims.

### III.

In count one of his amended complaint, Gregory Novak alleges that the administration of the blood transfusion of June 20—over his mother's and his objection on religious grounds—deprived him of

---

[5]The pleading is a quintessential "shotgun pleading." *See Pelletier v. Zweifel,* 921 F.2d 1465, 1518 (11th Cir.); *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1543 n. 14 (11th Cir.1985) (Tjoflat, J., dissenting).

[6]The Novaks have not appealed the district court's grant of summary judgment to the guardian *ad litem,* Robert Ingram. Our affirmance therefore runs only to the defendants before us as appellees.

the following

rights, privileges, and immunities secured to him by the Constitution of the United States:

(a) His right to be free from the deprivation of life, liberty, or property without due process of law under the Fifth Amendment ... made applicable to the States by the Fourteenth Amendment....

(b) His right to be free from the deprivation of life, liberty, or property, without due process of law under the Fourteenth Amendment....

(c) His right of religious freedom under the First Amendment ..., made applicable to the States by the Fourteenth Amendment....

(d) His right of personal privacy protected by virtue of the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendments....

(e) His right to equal protection of law under the Fourteenth Amendment....

(f) His right to freedom of contract, protected by the Fifth Amendment and/or the Fourteenth Amendment....

(g) His right to have his privileges and immunities as a citizen of the United States free from abridgement by the State of Georgia contrary to the Fourteenth Amendment ...; and

(h) His right to be free from deprivation of his liberty interest in maintaining his familial relationship with his mother under the Fourteenth Amendment....

Gregory Novak concedes, as he must, that the constitutional injuries he allegedly suffered would not have occurred had Judge Hines not issued the order authorizing the blood transfusion his physicians administered.[7] Moreover, if the issuance of the order constituted an independent act on the court's part, then it is of no moment whether, as the plaintiffs allege, Gregory Novak's

---

[7]The Novaks, however, did not join Judge Hines as a defendant in this case. They apparently felt that a suit against Judge Hines would be barred by the doctrine of judicial immunity.

physicians erred in believing that their patient's life was in jeopardy, the hospital and its attorneys erred in deciding to petition the superior court for the appointment of a guardian, and the guardian *ad litem* erred in asking the court to issue the order in question. On the record of this case, there can be no doubt that Judge Hines acted independently in issuing the order. Judge Hines, alone, decided to entertain the attorneys' petition, to appoint a guardian *ad litem,* to hold the hearing at the hospital, to summon and examine the witnesses, and to order the transfusion.

The Novaks' attorneys, anticipating this problem of causation, sought to avoid the problem by alleging that the transfusion Judge Hines authorized was the product of a conspiracy. By linking the defendants to the state actor, Judge Hines, through a conspiracy, counsel apparently believed that they could satisfy the requirements of 42 U.S.C. § 1983 and the Fourteenth Amendment. *See Jones v. Preuit & Mauldin,* 851 F.2d 1321, 1330 (11th Cir.1988) (en banc) (Tjoflat, J., specially concurring) (section 1983 requires proof of an affirmative causal connection between the action taken by the defendant and the constitutional deprivation), *vacated on other grounds,* 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989); *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990) (private defendants can be liable under section 1983 if they act in concert with state officials in depriving the plaintiff of constitutional rights), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991); *see also Dennis v. Sparks,* 449 U.S. 24, 27-29, 101 S.Ct. 183, 186-87, 66 L.Ed.2d 185 (1980) (though a judge may be immune from suit, private parties who conspire with him act

"under color of state law" for purposes of section 1983).  Counsel did not refer to Judge Hines as one of the conspirators by name; rather, they did so by implication—by alleging that the named defendants were either state actors or "private persons who acted jointly with, willfully participated with, or conspired with state actors or their agents under color of the statutes ... of the State of Georgia, and thereby *caused* Plaintiff Gregory Alan Novak ... to be subjected to the deprivation of [his constitutional rights]." (emphasis added).

Thus, in order to have *caused* Novak to suffer constitutional injury, the defendants had to have conspired with Judge Hines.  At oral argument, the Novaks' attorneys were asked whether the record contained any evidence that any of the defendants conspired with Judge Hines to obtain a court-authorized transfusion.  They said it did not.  Having made that concession, the Novaks' counsel argued that the defendants should be held to have caused the plaintiff's injury because they obtained the order from a court that the defendants knew or should have known had no jurisdiction to grant it.  Although the Cobb County Superior Court is a court of general jurisdiction, counsel contends that the only court with jurisdiction to authorize the transfusion was the Cobb County Juvenile Court.

The Novaks' amended complaint nowhere alleges that Judge Hines lacked jurisdiction to enter the order in question.  Their attorneys concede this point but contend that their allegations raise the inference that Judge Hines lacked jurisdiction to issue the order.  Drawing such an inference, they argue, would be

consistent with the spirit of notice pleading. We refuse to draw the inference; we do not consider on appeal claims that are not presented to the district court. *Glenn v. United States Postal Serv.,* 939 F.2d 1516, 1523 (11th Cir.1991); *Lattimore v. Oman Constr.,* 868 F.2d 437, 439 (11th Cir.1989).

Mrs. Novak's federal constitutional claims, which are contained in count thirteen of the amended complaint, suffer the same shortcomings. Liability is predicated on the existence of conspiracy, and there is none.

## IV.

In conclusion, we find no cognizable federal constitutional claims in this record and therefore affirm the district court's grant of summary judgment. We also affirm the court's dismissal of the Novaks' pendent state law claims without prejudice. Finally, because we find this appeal to be frivolous with respect to appellants' claims against Dr. Gray and the hospital's attorneys, we award them double costs and reasonable attorney's fees. Those fees shall be determined by the district court following receipt of our mandate. *See* Fed.R.App.P. 38; *Pelletier v. Zweifel,* 921 F.2d 1465, 1523 (11th Cir.); *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).

SO ORDERED.